[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON DEFENDANT'S MOTION TO MODIFY JUDGMENT
The defendant has moved, pursuant to the provisions of46b-86(a) of the General Statutes, for modification of a stipulated modification of judgment regarding alimony entered on May 20, 1987.
Many of the facts that give rise to this motion are not in dispute.
The marriage between the parties was dissolved on July 30, 1980 after a marriage of 27 years. The dissolution decree provided for the defendant to pay to the plaintiff alimony in the amount of $250.00 per week. In September 1983 the judgment was modified to increase alimony to $375.00 per week. On May 20, 1987 by stipulation of the parties alimony was increased to $480.77 per week ($25,000.00 per year). The stipulation for modification entered on the record on May 20, 1987 and approved by the court (Freedman, J.) was as follows:
 "We have agreed that alimony shall be forthwith modified to $480.77 per week which totals $25,000 per year and shall be non-modifiable henceforth except the defendant may ask for a modification if he retires or loses his job under any circumstances which would reduce his salary $50,000 or more.
 By $50,000 or more below that level which is reported here today in his financial affidavit.
THE COURT: It's $123,604.
MR. FALCONE: That's right.
 THE COURT: But that isn't the significant figure if I hear you correctly. It's whether it goes down — oh, I see, if it goes down by $50,000 from that $123,604.
MR. GREENFIELD: That's correct. CT Page 9025
MR. FALCONE: That's right.
 THE COURT: Yes, It's not an automatic reduction, it's a right to come in and seek a modification.
MR. GREENFIELD: That's correct.
MR. FALCONE: That's right.
 MR. GREENFIELD: And if your Honor please, the right to seek a modification is in the event of retirement irrespective of what the retirement benefits may be. In other words, the $50,000 only applies to a reduction in salary by reason of any — for any reason, but the retirement itself is sufficient for him to be able to come into court and seek a modification. Whether or not the court will grant it is something else again."
Section 46b-86 (a) of the General Statute provides in part as follows:
 "Unless and to the extent that the decree precludes modification, any final order for the periodic payment of permanent alimony . . . may at any time thereafter be continued, set aside, altered or modified by said court upon a showing of a substantial change in the circumstances of either party . . ."
The threshold question is whether the defendant has met the requirement that he has either retired or lost his job and that such job loss has reduced his salary: From $50,000 or more from $123,604.
In claiming that the defendant has not met the $50,000 threshold, the plaintiff makes the following argument:
 "By virtue of the Stipulation of May 20, 1987, the defendant may seek a modification downwards of his alimony payments, only if his salary falls below $73,604.00 by virtue of retirement or loss of job. Since that Stipulation, the defendant has held at least four different positions (other than the presidency of Stone Safety, which ended in August of 1987), to wit: (a) Dowling Ford (sales); (b) J A Enterprises (water filtration devices); (c) his partnership in the Glen Hair Group; and (d) the ownership of Country Farms, a delicatessen. CT Page 9026 By his own testimony he "lost" none of the four positions, but voluntarily chose to abandon positions (a), (b) and (d). (He remains a partner in position (c), The Glen Hair Group. ) By any dictionary definition, "loss" denotes an involuntary situation, or an inability to keep. This observation might well be important in any motion for modification based on reduction of income, but the comparison holds particular significance here in light of the parties' Stipulation of May 20, 1987. Clearly, Mr. Matheis voluntarily abandoned his current position as owner of the delicatessen/convenience store. By his own testimony, he neither sought expert advice when he brought the store, nor did he seek expert advice when it floundered under his management."
The court is not persuaded by that argument.
In October of 1987, the defendant attempted to modify the May 20, 1987 judgment upon a rule to show cause to reduce his alimony payments. This motion was denied by the Court (Bassick, J.) following a hearing on December 2, 1987. In his Memorandum of Decision, in denying the motion for modification, Judge Bassick ruled in part as follows:
 "The defendant lost his job as President of Stone Safety corporation on August 5, 1987. To that point the defendant had been paid $66,765.00 and he received an additional amount of salary for one-half a year of $61,800.00, for a total effective salary of $128,565.00. The defendant received considerable additional sums by way of bonus and deferred compensation, which for purposes of this motion and based upon the stipulation of the parties in May, 1987, is outside the court's consideration. On August 26, 1986, the defendant took a job as a salesman for Dowling Ford in Cheshire, earning an average of $381.00 gross wages per week. In January, 1988, the defendant will receive an additional salary of $61,800.00 from Stone Safety Corporation and estimates he will earn $20,000.00 — $25,000.00 at his position at Dowling Ford, so that total wages for 1988 will be $81,800.00 — $86,800.00 per year." (emphasis added)
From the evidence presented to this court, as well as from the finding of Judge Bassick that "the defendant lost his job as President of Stone Safety Corporation on August 5, 1987", this CT Page 9027 court also enters a finding that the defendant lost his job as President of Stone Safety Corporation on August 5, 1987. It is a loss of that employment, if coupled with a $50,000 or more loss of salary, that the defendant would have the right to seek modification of the May 20, 1987 modification of judgment.
From the evidence presented, the court finds that the defendant's total salary in the calendar year 1990 was $34,576. That salary has resulted in the $123,604 salary that existed on May 20, 1987 being reduced by more than $50,000. Therefore, the defendant is not precluded from seeking a modification of the amount of alimony.
One of the issues before the court is whether in ruling on the defendant's motion for modification of alimony it would be appropriate for the court to consider earning capacity. The court requested both attorneys to submit to the court memorandum of law on this issue. The court wishes to express appreciation to both counsel for their promptness and thoroughness in briefing this issue.
In claiming that the stipulation entered into between the parties on May 20, 1987 precludes earning capacity from being considered by the court, the defendant argues in part as follows:
 "Before summarizing the court opinions in each of those cases, however, defendant is constrained to call to the court's attention that by reason of the nature of the stipulation of the parties on May 20, 1987, it can be inferred that the parties (and the court which approved the stipulation) never intended earning capacity to be used as the basis for any subsequent modification because the very nature of the stipulation afforded defendant the right to seek a modification based on reduction in salary irrespective of earning capacity; ie: while earning capacity may have remained unchanged, he could seek relief if he retired or lost his job and had his salary reduced by $50,000.00 or more.
 Accordingly, we respectfully submit that the court should not use earning capacity as the basis of its decision."
The court is not persuaded by that argument.
While it is true that the defendant had the right to seek a modification based on a reduction in his salary by $50,000 or more regardless of earning capacity, it is also true that under the CT Page 9028 stipulation that was entered, a reduction of $50,000 or more in salary would not automatically reduce the alimony award but would only give the defendant the right to come in and seek a modification. There is nothing in the stipulation entered into between the parties that would prohibit the court from considering earning capacity where appropriate as well as all of the other statutory criteria.
The court makes the following additional findings of fact. Following his termination as president of Stone Safety Corporation on August 5, 1987, the defendant took a job as a salesman for Dowling Ford in Cheshire, Connecticut earning an average of $381 gross wages per week. He left that job in early 1988 believing that there was no future in that business. Later in 1988 he invested $5,000 to $10,000 into J A Enterprises, a water filter business. He remained with that business for approximately one year until 1989. On March 20, 1990 he purchased Country Farms Dairy Store, a large convenience store and grocery store. The purchase price was a total of $350,000, consisting of $200,000 in cash and $150,000 purchase money note taken by the seller to be paid over a period of ten years at the rate of 8 percent. The $200,000 was taken from the defendant's savings, stocks and other liquid assets. The defendant's income tax return for the calendar year 1990 shows that he had gross wages from that business during that year of $34,576. A sworn financial affidavit submitted by the defendant in connection with his deposition taken as a result of the motion to modify filed by him shows that he was continuing to draw a weekly salary from that store of $692.30. He transferred the business back to the former owner in August 1991. The consideration for the transfer was the forgiveness of the balance of the $150,000 purchase money note which had a balance in August of 1991 of approximately $136,000 plus the cancellation of the remaining term of the ten year lease plus the buyer assuming $21,000 of the defendant's trade debts in the business. The defendant also owns a one-half interest in a beauty shop business that is run by his current wife. Approximately 4 to 5 years ago a loan in the amount of $20,000 was taken out to purchase that business and there is presently a balance due on that loan of $19,000. The beauty shop business has shown a loss for each year that it has been owned. It is the defendant's claim that he did not voluntarily sell the business but rather transferred it back to the prior owner because the business was losing money from the time he purchased it. The defendant testified that the business was doing a gross annual volume of $900,000 per year when he purchased the business and also had annual lottery ticket sales of $200,000. He testified that the seller made $60,000 in 1989 from the grocery store business plus an additional $30,000 from lottery sales. The defendant further testified that the gross volume of sales dropped approximately $300,000 during the time he owned the business. He claims to have had an average of approximately CT Page 9029 $7,000 monthly negative cash flow from the business. It is his claim that the economy fell apart and, therefore, it resulted in the gross volume falling from approximately $900,000 annually to $600,000 annually. It is his claim that he had to put back from his own funds approximately $100,000 into the business in 1990 and that from January 1, 1991 to July 30, 1991 he had to put into the business an additional amount of approximately $45,000. The defendant points to his 1990 joint income tax return that shows a loss from the business on schedule C of $36,199. It is based on the above testimony that the defendant claims that he did not voluntarily leave that employment and, therefore, earning capacity should not be considered. The defendant claims that it was due to the fact that the business was losing money that he transferred the business back to the prior owner.
The court is not persuaded by that argument. The basis for showing a loss in 1990 from the business as shown on the joint tax return of the defendant and his present wife is based in part on that profit and loss shown on schedule C of the tax return showing gross receipts of sales of $464,634 and cost of goods of $319,841 for a gross profit of $144,793. However, the defendant's testimony before this court was that when he purchased the business it was doing a gross of $900,000 annual sales and that it was not until the business was finally sold in August of 1991 that the gross annual sales had been reduced by approximately $300,000 to approximately $600,000. Therefore, the claim of the defendant as shown on his 1990 income tax return that his gross sales were only $464,634 and that, therefore, he had a loss of $36,199 is not credible. Based on the defendant's own testimony his gross sales for 1990 should have been approximately $600,000 or $136,000 more than was reported. This would have resulted in a gross profit for 1990 of approximately $100,000 rather than a loss of approximately $36,000.
In the appropriate circumstances, the court may consider a party's earning capacity rather than salary earned. Johnson v. Johnson, 185 Conn. 573 (1983); Miller v. Miller, 181 Conn. 610,611-12, 436 A.2d 279 (1980): McKay v. McKay, 174 Conn. 1, 2,381 A.2d 527 (1977). The rule on the use of earning capacity as stated in Miller v. Miller, 181 Conn. 610, 611-612 follows:
 "It is well established, and the defendant does not dispute, that under appropriate circumstances, the trial court may, in a marital dissolution proceeding, base financial awards on the earning capacity rather than the actual earned income of the parties. . . . Nor do we agree with the defendant's contention that reliance on earning capacity is improper in the absence of a finding that the defendant wilfully depleted his earnings CT Page 9030 with a view towards denying or limiting the alimony to be paid to his wife. Our cases indicate that it is permissible to utilize a party's earning potential in making financial awards where, as here, the earnings of that party are voluntarily depleted so as to deprive the spouse of financial support. (emphasis provided)
Having concluded that the defendant's business was not losing money, this court enters a specific finding that the defendant has voluntarily depleted his earnings so as to deprive the plaintiff of financial support.
The defendant further argues that even if earning capacity were applicable, that there was insufficient evidence of what the defendant's present earning capacity is upon which the court can make a determination.
The court is not persuaded by that argument. The defendant's financial affidavit that is in the file dated January 23, 1980 shows that at that time he had a gross weekly wage of $1,020.77. In addition he was to receive his 1979 bonus in 1980 which would approximate $4,675 net after taxes. He was also deferring income of $160 per month to be paid into a company deferred compensation plan which would not be available until he reached age 65. He is now 60 years of age. His financial affidavit of June 30, 1980 showed he had gross weekly earnings of $1,020.77 and was also deferring income of $160 per month to be paid into the company deferred compensation plan. His financial affidavit of December 9, 1982 showed gross weekly wages of $1,640.19. Approximately $90 per week was being paid into into a deferred compensation plan. As stated earlier his May 20, 1987 financial affidavit showed gross weekly earnings of $2,377. He was drawing a weekly gross salary from the Country Farms Dairy Store of $692.30 up to July 19, 1991.
In discussing the issue of what type of evidence is required in order for an award to be based on earning capacity, the court in Schmidt v. Schmidt, 180 Conn. 184, 190-191 (1980) stated in part as follows:
 "This question then remains: when a award of alimony and support are to be based upon earning capacity, what type of evidence is required to support that award? Although it is true that there was evidence that supported a finding that the defendant earned a substantial income in the past as a commodities broker, there was no evidence, and hence no finding, of any specific amounts of such income. Under the circumstances, CT Page 9031 the award of alimony and child support can only be based on speculation and conjecture and cannot stand. This case is to be distinguished from Mckay v. McKay, supra, where we affirmed the trial court's award based on earning capacity. In McKay there was evidence of the specific amount once earned by the defendant. . . . In this case there was no evidence of the defendant's past salary as a commodities broker, or of the typical salary of a commodities broker of the defendant's ability and experience."
This court concludes that based on the findings made of the prior earnings of the defendant that there is sufficient evidence upon which to base an award of alimony upon earning capacity. This court enters a specific finding that the defendant has an earning capacity of $34,576 based on the amounts that he was being paid over the approximate sixteen months that he ran the Country Farms Dairy Store.
The court has therefore considered the defendant's earning capacity and all other relevant statutory criteria in ruling on the Motion to Modify. The parties are in agreement that any modification of the existing alimony award of $480.77 weekly should be retroactive to July 9, 1991. As of the date of hearing before this court on October 3, 1991, the defendant was current in his alimony payments.
The court enters the following orders:
1. The order for periodic alimony is modified to $220.00
2. The new weekly amount of $220 results in the defendant being entitled to a credit of $260.77 weekly ($480.77 less $220) x 12 weeks (the retroactive date of July 9, 1991 to the hearing date of October 3, 1991) for a total credit of $3,129.24. This credit may be taken by reducing the new alimony award of $220 weekly by $50 per week to $170 per week for the next 61 weeks following October 3, 1991 and by reducing the new alimony award of $220 weekly by $79.24 to $140.76 on the 62nd week following October 3, 1991, after which the $220 weekly alimony award will resume in full.
3. The defendant is ordered to forthwith notify the plaintiff by registered mail, return receipt of any new employment he obtains including the name and address of the employer, the position he obtains and his gross weekly earnings.
4. The defendant is to forward to the plaintiff by registered mail, return receipt a copy of his future income tax CT Page 9032 returns that are filed by him commencing with the income tax filed for the calendar year 1991 and annually thereafter.
Sidney Axelrod, Judge